**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
_____

|  |  |
|---|---|
| ) | **CASE NO.** |
| TSURT, LLC. and PEARL JAM, LLC,    ) | |
| ) | |
| Plaintiffs,    ) | **DECLARATION OF** |
| ) | **CHRISTOPHER SIGLIN** |
| ) | |
| v.    ) | |
| ) | |
| VARIOUS JOHN DOES, JANE DOES and    ) | |
| ABC COMPANIES,    ) | |
| ) | |
| Defendants.    ) | |
| ) | |
| ) | |
| ) | |
| ) | |

_____ )

I, CHRISTOPHER SIGLIN, declare:

1.      I am the President of TSURT, LLC. ("TSURT"), exclusive authorized licensee for the manufacture and sale of merchandise embodying the names, logos and trademark of the musical group known as Pearl Jam and the likenesses of the individual members of Pearl Jam.

2.      I submit this declaration in support of Plaintiffs' Motion for a Temporary Restraining Order, Order of Seizure and Preliminary Injunction.

3.      I have owned and been President of TSURT for more than 20 years.  Prior to being President of TSURT, I worked for F.E.A., another merchandising company. In my nearly 30 years working in music-related merchandising, I have worked on more than 40 tours, including supervising bootleg security. On TSURT's behalf, I am overseeing the merchandising and security on the current Pearl Jam tour. A copy of the remainder of the 2024 Pearl Jam tour itinerary is attached as Exhibit A to the Complaint.

4.      Since 1975, various merchandising companies like TSURT have been engaged in the business of selling articles of clothing, jewelry, posters and similar merchandise featuring the names, trademarks and/or likenesses of major popular musical performers.  These merchandising

companies conduct their activities pursuant to licensing agreements with musical performers at more than 1,000 concerts per year.

5.    TSURT's activities with respect to Pearl Jam are pursuant to an exclusive license agreement pursuant to which Pearl Jam has granted exclusive rights to TSURT to sell all merchandise bearing the Pearl Jam trademark, logos and likenesses.

6.    Pearl Jam began performing in 1991 and has sold over 30 Million copies of recorded product including more than 10 million copies of its "Ten" album.  Pearl Jam has released 10 studio albums and 15 live albums. Five of Pearl Jam's albums have reached platinum status and it has received 2 Grammy awards and 13 Grammy nominations. More than 10 Million dollars' worth of licensed merchandise bearing the Pearl Jam trademark and logos has been sold.

7.    Parade Magazine has ranked Pearl Jam at Number 32 on its 2021 Hundred Greatest Rock Acts of All Time list. Pearl Jam was inducted into the Rock and Roll Hall of Fame in 2017.

8.    Because of Pearl Jam's status among music enthusiasts, this tour is highly anticipated and almost all of the tour's current concert dates are sold out.  The tour involves many large-capacity venue performances, i.e., arenas seating in excess of 10,000 people and we expect that approximately 250,000 fans have or will attend concerts on this tour.

9.    Pearl Jam derives income and promotes its image in part from sales of recordings and live performances and in part through the sale of merchandise associated with them. Plaintiffs spend a great deal of care, time and money developing the merchandise associated with concert tours.  Care is taken that the tour merchandise bearing Pearl Jam's trademark, logos or likenesses is of a high quality and is appropriate to their image.

10.    At almost every concert performance that I have attended of Pearl Jam and performing artists of Pearl Jam's status, I have observed unnamed and unlicensed individuals representing either themselves or unnamed and unlicensed manufacturing, printing and/or distributing companies, selling unauthorized merchandise bearing the name, trademark, logos and/or likeness(es) of the performing group or artist appearing thereat.  The subject illegal sales took place and continue to take place outside the concert halls to the concert-going public. Infringing shirts have been sold on dates on prior Pearl Jam's tours.

2

11.     The bootleggers do not readily identify themselves and go to great lengths so that they are not identified by giving out false names, using fake identification and using rental vehicles to transport their merchandise so that they cannot be identified by their license plates. When I inform the bootleggers that they are selling unauthorized merchandise, they ignore my requests or the requests of my security personnel to stop selling unauthorized merchandise. Defendants generally respond that they want to see my "injunction" or "order" or else they will not stop their unlawful activities.  From the nature and context of their statements, it is obvious that the "order" or "injunction" to which they are referring is a seizure and impoundment order similar to the one Plaintiffs seek from this Court.

12.     The merchandise, sold by the above-described individuals, is imitative of the merchandise sold by Plaintiffs except for the fact that said merchandise is of inferior quality.

13.     Upon my own observation and the information that I have received from concert promoters, concert hall managers, other legitimate merchandisers and security personnel, I know that:  (a) major bootleggers base their manufacturing operations in many locations around the country; (b) they obtain concert tour itineraries and send out crews in unmarked vehicles to follow a band's tour; (c) they station themselves nearby the concert venues often just outside the legal reach of concert hall managers or law enforcement officials; and (d) then the crews sell the infringing merchandise directly to the public or they sell items to dozens of local sellers, who then set up movable sales stations on the access roads and parking lots near the concert venue.

14.     The traveling bootleggers or their local sellers are the first merchandise sellers who the fans see when approaching the concert.  We see the exact same shirts (showing that those shirts are all manufactured by the same parties) sold by the bootleggers at different concerts throughout the tour.  Most of those shirts list the entire concert tour itinerary which allows the bootleggers to sell the same shirts at all concerts on the tour.

15.     By the time the concert-going fans reach the concert hall, where authorized concert hall merchandisers maintain their legitimate concession stands, these fans have already purchased their desired allotment of what they are led to believe is custom merchandise sponsored, authorized and designed by their favorite artists.

16.    As for those fans who decide to buy a souvenir after witnessing the exciting Pearl Jam concert, the bootleggers await their departure from the venue with more merchandise, equally illegal and inferior.

17.    As a result, we have received complaints and refund requests from purchasers of bootleg merchandise due to quality defects or outrageous price differentials, all of which reflects unfavorably on the artists whose rights have been infringed.

18.    Because of the bootleggers' outrageous contempt for the law and our clients' rights, the legitimate market and our exclusive license will be destroyed if we do not receive nationwide seizure relief.

19.    Piecemeal, isolated and locally obtained restraining orders enforceable only at a particular concert hall provide incomplete relief and are too expensive to obtain except at only the largest shows.  Since the bootleggers are usually aware of whether a "seizure order" is in effect, seizure orders for one concert facility are merely a slight inconvenience to the major bootleggers who follow the group throughout their entire concert tour.  If Plaintiffs were able to obtain seizure relief for only one concert, the bootleggers would merely avoid that particular concert.

20.    Based on my experience, Defendants will appear at the performances on the remainder of the current Pearl Jam tour, as they did in New York, New York in 2022 and other cities on the first leg of the Pearl Jam 2024 tour, to sell unauthorized merchandise, unless this Court grants the order that Plaintiffs seek.   Bootlegging activities greatly injure musical performers and legitimate merchandisers, including TSURT.   Defendants are not bound by contract to provide first-quality apparel and graphic designs as TSURT is required to provide. Defendants also can drastically undersell the legitimate merchandiser, because, unlike Plaintiffs, defendants have no obligation to pay royalties and do not have to pay any part of their gross sales receipts to the concert venue.  This ability to undersell the legitimate tour merchandise is also enhanced by the fact that Defendants do not collect or pay sales taxes.

21.    The consumers (the fans) also suffer.  Unauthorized merchandise is of inferior quality.  Many t-shirts appear to be seconds and the colors on the designs tend to "run" or "bleed" into each other.  Fans are disappointed and, in their confusion as to the source of the

unauthorized merchandise, blame the artist which creates negative feelings by the fans directed against the artists.

22.    Defendants' unauthorized merchandise is intended to and will cause the general public to believe that their merchandise is authorized, approved and sponsored by Pearl Jam. Consequently, not only does the sale of this unauthorized merchandise violate Plaintiffs' exclusive rights, but it also causes the general public to be adversely affected and irreparably harms Plaintiffs' reputations for excellence and integrity in legitimate tour merchandise.

23.    The precise damage to Plaintiffs is incalculable.  The unauthorized merchandise generally sells for less than half the price of the genuine tour merchandise and the people involved in the illegal merchandising activities maintain no records.  On the basis of my past experiences with such defendants, I believe that these Defendants would dispose of or destroy any unauthorized merchandise or related documents should legal proceedings be commenced against them.

24.    The difficulties in identifying Defendants and the fact that they have no fixed place of business make them virtually immune to normal process or to any process except by way of restraining order against persons unknown and allowing the seizure of the unauthorized merchandise.

25.    We need effective relief on a nationwide basis similar to the orders issued by this District Court for other concert tours involving the musical groups and performers known as NICKI MANAJ, JONAS BROTHERS, HARRY STYLES, DRAKE, JOHN MAYER, BRUCE SPRINGSTEEN and THE E STREET BAND, LADY GAGA, ONE DIRECTION, BEYONCE, PHISH, LINKIN PARK, THE ALLMAN BROTHERS BAND, DEPECHE MODE, IRON MAIDEN, LIL BOW WOW and B2K, BILLY CYRUS, AEROSMITH, WASP, TWISTED SISTER, BLACK SABBATH, MOLLY HATCHET, JUDAS PREIST and others.

26.    A fully enforceable restraining and confiscation order is needed extending a sufficient distance from each concert hall so as to reach the immediate illegal source, the vans that park on access roads and distribute contraband.

27. The Court should note that legitimate merchandise is only sold through the legitimate concessionaires in booths either inside the facility or immediately surrounding the facility. Therefore, it is easy to recognize the unlicensed merchandise because all merchandise sold outside of the aforesaid areas is infringing.

28. These bootleggers will almost certainly appear outside Madison Square Garden, New York, New York on September 3 and 4, 2024, as they did on the Pearl Jam 2022 tour, and at every other Pearl Jam concert on the remainder of the 2024 tour particularly because the remaining concerts are in the Northeast where bootlegging is significantly more widespread than it is in the Midwest.

29. The people who serve the orders and seize infringing merchandise consist predominately of off-duty law enforcement officers who are well versed and trained in seizing infringing merchandise. They will seize only the infringing merchandise and provide receipts. They do not make arrests, as it is a civil seizure order. The objectives are to serve the restraining and seizure order, preserve the infringing merchandise, to determine if Defendants will provide source information (which they rarely provide), and provide a receipt, then move on to the next bootlegger.

30. TSURT is a substantial and successful business and will be able to meet any order made to compensate any Defendant for any damages suffered as a result of any order obtained on our behalf. However, in my experience, no bootlegger has ever appeared at an order to show cause hearing or sought relief in the countless number of nationwide seizure orders that have been issued. Plaintiffs also request that the Court appoint it as substitute custodian for all seized merchandise.

31. In short, absent protection from the courts in the form of a seizure order, Defendants have an insurmountable advantage over the performers and legitimate merchandisers who obtain the right to use the performers' trademarks, likenesses and logos.

32. The bootleggers will undoubtedly be selling at the concert at Madison Square Garden and subsequent concerts undeterred unless the order that Plaintiffs is requesting is granted.

33.    The effect of this unlawful activity is as follows:

   A.    The goodwill generated by Pearl Jam will be diluted and abused;

   B.    The general public will be confused as to the source and sponsorship of the merchandise sold by the bootleggers;

   C.    Bootleggers will be passing off our exclusive merchandising rights as if the rights were theirs;

   D.    The Pearl Jam mark will be infringed upon and substantially diluted; and

   E.    The loss of an incalculable amount of revenue will occur, particularly since Defendants, together with the proceeds realized as a result of their unlawful activities, will disappear from the jurisdiction of this Court as soon as the concerts have been completed.

34.    Unless the imitation merchandise is seized, Plaintiffs will suffer immediate and irreparable injury and harm for which Plaintiffs have no adequate remedy at law.

35.    In view of the foregoing, it is respectfully requested that the Court grant Plaintiffs' motion for Temporary Restraining Order and Order of Seizure.


Executed at New York, New York on the 2nd day of September, 2024.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.


_____
CHRISTOPHER SIGLIN